DeVORE, J., dissenting.
Notwithstanding the majority's considered opinion, I believe that the law requires that the court conclude that, absent speculative inferences, there was no evidence from which to conclude that the initial and primary transfers of corporate shares from husband's parents to him at the end of 2006 and the beginning of 2007 were purchased pursuant to an agreement. Instead, this record requires a conclusion that husband's interest in the business was initially received without payment as gifted property. I agree, using a different description, that there was evidence that, five years later, the disposition of husband's proceeds from the sale of the Clackamette part of the business resulted in commingling marital money and business property. As a result, our decision should have reversed in part and remanded so *371 that the trial court could determine the value of wife's interest in gifted and commingled property.
Respectfully, I believe that the majority's analysis fails to recognize that recent legislation removed a default presumption that property acquired during the marriage is marital property. With no default presumption in play, the parties presented a binary choice between gifted or purchased property-one that makes speculative the assumption of a long-standing, preexisting, purchase-agreement. Nevertheless, the majority's analysis continues to operate on an outdated, default presumption, assuming that husband more than wife bore the burden of characterizing property as gifted or purchased.
The majority posits that the gift issue does not ultimately matter, because, in any event, the court may disregard the character of gifted property in consideration of what is just and proper. Although the court may consider what is just and proper as the last step in gift analysis, it is a careful step that is counseled or cabined by overriding considerations. The majority, like the trial court, is not so careful. The judgment affirmed misapplies *867 and exaggerates that last step in gift analysis. It does not rely on overriding considerations. Thus, I fear that this court's decision operates on a speculative inference of fact and two errors of law.
I. FACTS
The historic facts, involving husband's entry into the business, are undisputed. Years before the parties met, husband's parents sold their house and invested in a single McDonald's fast-food franchise. They formed Expressway Restaurant Holdings, Incorporated (Expressway), and it grew to include three McDonald's restaurants located in Milwaukie, Oak Grove, and Clackamette Park. Husband worked in the business from the ages of 13 to 16. In 2003, he returned as a manager trainee, intending to go through McDonald's Second Generation Program, in hopes of taking over the family business. To begin the program, husband needed to acquire a minimum 20 percent ownership. To become a primary operator, husband needed a majority ownership in his parents' business.
*372 At trial, husband testified that he and his parents discussed succession many times and in many ways. His father testified that the discussion "began long before" husband and wife "even knew each other." Husband's mother testified that the decision to give husband shares in Expressway "had been made long before" husband met wife.
Hall, a certified public accountant at the Strader Hallett firm, testified that the firm had advised husband's parents about "retiring" the father from the business. Hall explained that the discussions "included a number of different scenarios and possibilities." He testified, "There's no one right answer" because families and circumstances vary. He recalled, "[W]e explored sales, we explored gifting, we explored combinations of both. And, at the end of the day, the gift scenario appeared to be the best match."
Husband's father testified, "We knew that from a financial standpoint, [husband] didn't have sufficient cash reserves to make a purchase." For that reason, husband's parents testified, they gifted to him shares in Expressway in transfers just before and after the year's end, on December 31, 2006, and January 1, 2007. Together, the 2006-2007 transfers provided husband with 2,495 shares, representing 49.9 percent ownership of the corporation. His parents retained the fractionally larger half-interest in the business. The shares in the business were transferred to husband in his name only; wife's name was not on any shares. There was no evidence at trial to indicate that husband paid money or exchanged anything of value, at that time, in return for his receipt of 49.9 percent ownership of Expressway. Nor was there any evidence of any promise, expressed at that time, by husband to his parents about any future payment from husband's resources in exchange for those shares conveyed in 2006-2007.
Husband and wife had married four months before the parents' stock transfers. At trial, husband's father testified that he never intended to give stock to anyone other than husband, that he never intended to give wife an ownership interest, and that his intent was to allow husband to become an operator in the McDonald's franchise system.
*373 Husband's father testified that he never considered giving shares to wife.
The 2006-2007 transfers included shares from husband's mother, who was then a half-owner. She testified that she did not sell shares to husband, that she did not intend that the gift of shares to husband would be in the name of anyone other than him, and that she did not intend for wife "to receive an ownership in any of that gifting." When pressed about her son's marriage, she testified that the fact that husband was married to wife did not "in any way incentivize" her gift of shares to husband. Her gift was "independent" of the fact that husband was married.
The accountant, Hall, testified that there were no documents that indicated any sale of stock in Expressway to anyone. In conjunction with the 2006-2007 transfers, the parents filed gift tax returns with the Internal Revenue Service (IRS).
Five years passed without any further change of ownership, change in the father's participation in the business, or change of the *868 three franchises comprising the business. In the meantime, the parents, husband, and wife worked in the business, drew salaries and wages, received dividends, and caused the business to pay personal expenses.
While caring for the parties' infant son, wife helped husband's mother with the business's bookkeeping and payroll. In her first year, she was paid $10,200, and husband was paid much more, but, according to wife, "all the money was going to the same place," so she felt that it did not really matter. In 2009 or 2010, she took on more of the bookkeeping responsibilities from husband's mother, who worked less. Correspondingly, wife's income increased. She earned $25,733 in 2010, $38,500 in 2011, and $40,000 in 2012, her last full year with Expressway. Wife worked 25 to 30 hours per week.
At trial, wife introduced a list of expenses that Expressway paid from its revenues for personal expenses of husband, wife, and child. Those monthly expenses included the family's health insurance, meals, unreimbursed dental and medical expenses, and husband's company vehicle.
*374 Those monthly expenses also included a variety of other personal expenses, such as household utilities, their son's school tuition, clothing, and personal grooming.
At trial, another accountant, Russell, testified that small business owners often initially record personal expenses as business expenses paid by the business. In the course of tax preparation, however, an accountant will distinguish between expenses that qualify as business expenses and personal expenses that do not qualify and then recharacterize the payment of personal expenses as draws reflecting income to the owner. Russell estimated, after such sorting, that the business paid about $2,000 monthly of personal expenses.
In 2012, several events affected business assets, ownership, and participation. Expressway sold the restaurant at Clackamette Park; husband's father transferred to husband 45 shares in the business; and husband's father retired from active participation in the business. Wife testified that the father transferred the shares to husband after the Clackamette sale in the summer of 2012. The added shares boosted husband's ownership by 0.2 percent from 49.9 percent to a majority position at 50.1 percent. Husband was then qualified to be a primary operator of McDonald's franchises, putting him in the "P1" position. Husband claimed that his father's transfer of 45 shares was another gift. Unlike in 2006 and 2007, however, there was, in 2012, no evidence of a gift tax return to reflect a gift from father to husband.
After paying debts and taxes, the net balance of the Clackamette sale proceeds was $520,000. Rather than retain those proceeds in the corporation, the money was distributed to its shareholders, husband and father.[1] Speaking generally, husband testified that, "because of [his] ownership, [husband] got half of the money-as distributed through the ownership." There was no written agreement between husband and his father as to the arrangement, but husband testified that his father had received funds in *375 "cash" and in "gift" from husband to father.[2] At trial, husband was not asked the amount of his "gift" to his father. Husband said that the transfers were in consideration of his father giving up a $75,000 annual salary and further payment of personal expenses run through the corporation.
Wife testified that the plan had been to provide husband's father with the means to retire. She testified that the plan was for the father to receive the proceeds of the Clackamette sale, $180,000 to be paid over time, a large draw or "loan" of $25,000, a "gift" of $25,000, payment of the father's credit card debt, payment of the balance of car loans, and payment of construction debt on the *869 father's house in Pacific City. When asked whether husband's father received the moneys contemplated, she replied, "Most of it, yes." In her view, this "global agreement" would have meant the transfer of the remaining balance of 49.9 percent of stock from father to husband, resulting in husband's ownership of 100 percent of the business's shares.
Contrary to wife's description of the "global agreement," however, husband's father did not transfer the remaining balance of shares to husband. Wife acknowledged that the balance of the shares had not been transferred. Thus, at the time of trial, husband had 50.1 percent ownership, not 100 percent ownership of Expressway. Husband had received 0.2 percent more shares in the business in 2012. Husband and his father testified that there were no plans for disposition of the remaining balance of the parents' ownership. Husband's father remained a 49.9 percent owner. In 2012, husband's father had received $520,000-the equivalent of the net balance of the Clackamette sale-received, in part, from the business as the father's own distribution and received, in part, from husband of what would have been husband's distribution.
At trial, wife explained her position saying, "I'm not trying to take something that's not mine." Referring to *376 husband's parents, she said, "My argument is simply that they've been paid." In her view, the substantial first set of stock transfers in 2006-2007, as well as the second, small transfer in 2012, "were purchased," because, in 2012, husband's father received the proceeds of the Clackamette sale and took draws and a salary.[3] Husband took the opposite view-that all of the stock transfers, both early and late, were gifts that should be treated as separate property excluded from the property division.
The trial court made findings about husband's acquisition of his interest in the business, and the court made other findings about commingling. Expressing both sorts of findings together, the court's judgment declared:
"A. Expressway Restaurant Holdings, Inc. ('the business') was valued by Husband's expert, Phillip Hall of Strader Hallet & Co. Mr. Hall's methodology made sense and he valued Husband's 50.1% ownership interest at $900,000. *** Husband's father, Alex Schwindt, received payment for some portion of the business, although not the entire amount. ***
"B. Wife cannot own a portion of the business because she is not a franchisee. Therefore, Husband is awarded his 50.1% share of the business at a value of $900,000.
"C. The transfer of the business to Husband was not a gift as defined by ORS 107.105(1)(f)(D). Although Husband's parents may have transferred it in this way for tax purposes, the evidence does not support that the transfer was truly a gift. The behavior of Husband and his family did not demonstrate what the parties may have intended by their earlier actions. Husband's testimony to the contrary was not credible.
*377 "D. The business is a marital asset. It was acquired during the marriage.
"E. Husband did not rebut the presumption of equal contribution. The evidence reflected that the parties used the business account as their personal account, paying for personal expenses throughout their marriage. Wife relied on the business as a joint asset. The business was treated as a *870 joint asset by the parties until the divorce loomed.
"F. Even if the court believed the business transfer was a gift alone, which is not supported by the evidence, the law requires the court to divide all property equitably based upon a just and proper analysis. The parties clearly commingled their business and personal assets. In addition, Wife's reduced income while working for the business is a marital contribution to the growth of the business and Husband's interest in the business, because her income was kept small for tax purposes. It would be inequitable to treat the business as separate property and the court declines to do so."
The court concluded that husband's interest in the business was subject to equal division. The court counted the "entire amount" of husband's interest as an asset in his column ($900,000). After awarding wife the marital residence (with its equity valued at $133,794), a vehicle, and minor accounts, the court determined that wife should have an equalizing judgment of "$396,940 representing [a] 50/50 division of assets."[4]
II. LAW
Oregon statute provides that, when the court enters a judgment of dissolution, the judgment may provide:
"(f) For the division or other disposition between the parties of the real or personal property, or both, of either or both of the parties as may be just and proper in all the circumstances. In determining the division of property under this paragraph, the following apply:
"* * * * *
*378 "(C) Except as provided in subparagraph (D) of this paragraph, there is a rebuttable presumption that both parties have contributed equally to the acquisition of property during the marriage, whether such property is jointly or separately held.
"(D)(i) Property acquired by gift to one party during the marriage and separately held by that party on a continuing basis from the time of receipt is not subject to a presumption of equal contribution under subparagraph (C) of this paragraph.
"(ii) For purposes of this subparagraph, 'property acquired by gift' means property acquired by one party through gift, devise, bequest, operation of law, beneficiary designation or inheritance."
ORS 107.105(1)(f). On the issue of gifted property, the statute represents a change in the analysis that had existed before and that wife had urged at trial. The statute eliminated the concept that a default presumption generally prevails when any property is received during the marriage. Instead, that default presumption, expressed in ORS 107.105(1)(f)(C), applies if the following subparagraph (D) does not apply.[5] Beginning in 2012, ORS 107.105(1)(f)(D) dispenses with the need for the recipient of gifted property to rebut a default presumption that the other spouse contributed equally to the acquisition of the gifted property. Brush and Brush , 279 Or. App. 25, 27-29, 377 P.3d 620 (2016). Prior to 2012, a recipient of gifted property needed to rebut that presumption in order to seek treatment of the property as a separate asset. See Davis and Davis , 268 Or. App. 679, 681-83, 342 P.3d 1117 (2015) (describing the former three step process).[6]
As husband argued below, ORS 107.105(1)(f)(D) now requires that the court determine whether or not property, *379 which was acquired during the marriage, was acquired *871 by gift and was separately held on a continuing basis. See Brush , 279 Or. App. at 28-30, 377 P.3d 620 (discussing effect of new provision); see also Johnson and Johnson , 277 Or. App. 1, 16-17, 370 P.3d 526 (2016) (trial court needed to have determined whether property was received by gift during the marriage and separately held on a continuing basis). Today, the court's determination that property was gifted and separately held has the same result as, under the older analysis, when a party rebutted the presumption of equal contribution. The result, tentatively, is that the gifted property will be distributed to the recipient spouse without effect on the property division. We have observed:
"Typically, '[w]hen a party proves that a marital asset was acquired without any contribution from the other spouse, absent other considerations, it is "just and proper" to award that marital asset separately to the party who has overcome the statutory presumption.' "
Johnson , 277 Or. App. at 14, 370 P.3d 526 (quoting Davis , 268 Or. App. at 681, 342 P.3d 1117 ); see also Kunze and Kunze , 337 Or. 122, 135, 92 P.3d 100 (2004) (citing Pierson and Pierson , 294 Or. 117, 123, 653 P.2d 1258 (1982) ).
Before the court can make the determination whether property is gifted property or ordinary marital property, it is, of course, the obligation of both parties to provide the court with evidence from which to identify assets, characterize them, and determine their value. See Salgado and Salgado , 258 Or. App. 557, 564, 310 P.3d 731 (2013) (rejecting proposition that one spouse had the burden of proving the valuation of a business); Cook and Cook , 240 Or. App. 1, 11, 248 P.3d 420 (2010) (rejecting the proposition that one spouse had the burden of proving the existence of a marital asset). Given that ORS 107.105(1)(f) eliminated a general or default presumption, each party is left to assert the appropriate characterization of the property. In this case, for example, wife chose to assert that husband's interest was acquired by purchase. See ORS 107.105(1)(f)(C) (ordinary marital property). And, at the same time, husband chose to assert his shares in Expressway were acquired by gift. See ORS 107.105(1)(f)(D)(i) (property acquired by gift). Thus, in *380 the absence of a default presumption and faced with competing characterizations, the parties presented the trial court with a binary choice.
A final question remains even after property is determined to be gifted property separately held. That question is whether the division of all the property-both ordinary marital assets and separate property-is "just and proper in all the circumstances." Kunze , 337 Or. at 135, 92 P.3d 100. That inquiry "takes into account the social and financial objectives of the dissolution, as well as any other considerations that bear upon the question of what division of the marital property is equitable." Id. Some of those equitable considerations include preservation of assets, economic self-sufficiency for both spouses, the particular needs of the spouses or their children, and "the extent to which a party has integrated a separately acquired asset into the common financial affairs of the marital partnership through commingling." Id. at 136, 92 P.3d 100.
As relevant here, that final inquiry concerns commingling, which may occur in at least two forms. Id. at 136-42, 92 P.3d 100. In its classic form, commingling occurs when separate property is combined with joint property, making identification of separate property unreliable. Mixing moneys in a joint account may be an example. Id . at 138, 92 P.3d 100. In another form, commingling occurs when a separate asset of one spouse is otherwise integrated into the parties' joint financial affairs so as to demonstrate the recipient spouse's intention that the asset becomes a joint asset of the marital partnership.[7] Id . at 139-41, 92 P.3d 100. When exploring whether separate assets have been "converted" to joint assets in that way, three factors may be considered:
"(1) whether the disputed property was jointly or separately held; (2) whether the *872 parties shared control over the disputed property; and (3) the degree of reliance upon the disputed property as a joint asset."
*381 Id. at 141, 92 P.3d 100. Elaborating, the Supreme Court has explained that:
"the court's inquiry properly focuses upon whether a spouse demonstrated an intent to retain that spouse's separately acquired asset as separate property or whether, instead, that spouse intended for that property to become the joint property of the marital estate."
Id. at 142, 92 P.3d 100. The court added, "We caution, however, that acts of commingling do not mandate in all cases the inclusion of separately acquired property in the property division." Id .
III. 2006-2007 STOCK TRANSFERS
A. Part Payment
In this case, the property division turns, at least initially, on the trial court's single conclusion that none of the parents' stock transfers to husband were gifts. To review that conclusion, I begin with one of the court's critical findings. In that finding, the trial court found that husband's father "received payment for some portion of the business, although not the entire amount ." (Emphasis added.) That finding can be reasonably read only one way. Immediately before that statement in the same paragraph, the trial court had just found that the value of husband's 50.1 percent ownership interest was $900,000. To use the court's words, the "payment" that husband's father "received" was for "some portion of the business" but "not the entire" $900,000 "amount " of the value of that business interest.[8] The quantitative term "amount " refers to a "payment" of part of a dollar value; the term "amount" does not refer to an "amount" of a business entity.[9]
That understanding is supported by the following sentences in the same paragraph, which refer to the "value of the business" and "value for [husband's] portion of the business." That understanding is also consistent with the court's spoken ruling, in which the court stated, "I find *382 that [husband's] interest is 50.1 percent, and that fair market value is $900,000. Father was paid, but not the entire amount ***." (Emphasis added.) My reading of the court's part-payment finding is confirmed by the evidence of the difference, discussed later, between the $900,000 value of husband's business interest and the smaller amounts that father eventually received in 2012 from husband and the business.
B. Two Sets of Transfers
When concluding that the parents' stock transfers were not gifts, the trial court treated alike two sets of transfers, occurring five years apart under potentially different circumstances. On one hand, the trial court's rejection of any gift at any time, might seem to accept wife's argument that all of the stock transfers, both early and late, were made pursuant to a purchase agreement-necessarily an agreement that had been determined from the outset. Wife argued, speaking of husband's parents, that "they've been paid" because, in 2012, husband's father received moneys after the sale of the Clackamette franchise.
On the other hand, the trial court made a contrary finding that did not agree with wife that the parents had been completely paid for everything conveyed. That is, the court found that husband's father had not received payment for all of the value of husband's interest in the business. Despite that finding, the court treated none of husband's interest as gifted property. Consequently, the trial court's conclusion to treat all of husband's interest in the business as if purchased, as wife urged, is inconsistent with the court's own finding that father had received only part payment.
The problem with the court's single answer-to treat all of husband's shares as *873 purchased-is that the circumstances presented two questions. The problem stems from the court's failure to recognize that questions posed by ORS 107.105(1)(f)(C) and (D) depend upon proof of the circumstances surrounding the acquisition of the property or properties at issue. Specifically, the problem with the court's single answer about treatment of husband's stock in *383 Expressway is that there was not a single transfer to husband at one time. Rather, husband's parents transferred their shares at two substantially different times, five years apart, under different circumstances. As noted, the primary transfers happened just before and after the year's end, on December 31, 2006, and January 1, 2007. Those initial transfers conveyed a 49.9 percent share of the business to husband. The later transfer occurred after the Clackamette sale in the summer of 2012 and conveyed an additional 0.2 percent share of the business. The answers as to each acquisition of stock are not necessarily the same.[10]
C. No Payment or Promise in 2006-2007
On this record, there was no evidence that husband paid anything-whether money or property-for the share transfers in 2006 and 2007 at or about that time of those transfers. There was no evidence that, at or about that time, husband made any promise to pay any sum certain at any future date from husband's personal assets. There was no evidence from which a nonspeculative inference could be drawn that, in 2006-2007, husband had entered into an actual agreement, whether written or oral, to draw on the parties' own assets in the future in exchange for those shares. See Hocks v. Hocks , 95 Or. App. 40, 45, 767 P.2d 1369, rev. den. , 307 Or. 658, 772 P.2d 1341 (1989) (observing that the trial court could properly conclude that there was insufficient evidence of a father's oral contract to make a will, where the plaintiff and father never reached an agreement as to how plaintiff was to obtain his 50 percent interest in the father's business). The only evidence in the record-the testimony from accountant Hall and husband's parents-is that the parents knew that husband "didn't have sufficient cash reserves to make a purchase." Wife did not dispute that fact.
*384 The undisputed evidence is that, when husband received 2,495 shares, representing 49.9 percent interest in the business at the year ending 2006 and the year beginning 2007, husband made no payment from any personal assets and was not shown to have made any commitment to pay from personal assets. Assuming that husband undertook the burden to come forward with evidence that shares had been gifted, just as each party must come forward to show the character of an asset, he satisfied that evidentiary burden. See OEC 307 (generally describing burden of coming forward with evidence).[11]
At least as presented in this case, the issue then became whether wife offered any evidence of circumstances in 2006-2007 to the contrary. That is so because the issue was a choice between the alternatives of *874 ORS 107.105 (1)(f)(C) or (D). As the parties posed the key question, "purchase or gift" was a binary choice in this property division, one in which both parties bore a burden of identifying assets and showing their value. See Salgado , 258 Or. App. at 564, 310 P.3d 731 (valuation of a business); Cook , 240 Or. App. at 11, 248 P.3d 420 (existence of a marital asset). Wife asserted, implicitly if not explicitly, that all transfers, including those made early, were the product of a preexisting purchase agreement. Of that fact, at least some evidence was necessary to contravene the evidence shown by husband so as to allow the court an evidentiary basis from which to find that those early shares were indeed purchased pursuant to a preexisting agreement to pay for them. *385 Although husband's parents were subject to cross-examination, wife's counsel elicited no testimony from the parents to suggest that the parents had transferred nearly half of the business with a commitment of present or future payment from husband in return for those shares. For her part, wife did not claim that husband paid anything or promised anything at that time when he received 49.9 percent of Expressway. Contrary to wife's argument that husband's parents were, in the end, somehow "paid," there was no evidence in this record of any verbal or written contract of sale causing the 2006-2007 transfer to husband of nearly half of the business interest.
To permit the trial court to conclude that there was no gift, at any time , the record would require some evidence that there was payment or a contemporaneous agreement to pay that caused the 2006-2007 transfers of shares in the business. But, there was none. See Hocks , 95 Or. App. at 45, 767 P.2d 1369 (insufficient evidence of a father's oral contract to make a will involving a 50 percent interest in the father's business); see also Salgado , 258 Or. App. at 564, 310 P.3d 731 (regarding proof in a property division); Cook , 240 Or. App. at 11, 248 P.3d 420 (same).
D. Evidence of Parents' Intent
To explain why the trial court made no distinction between the 2006-2007 transfers of 49.9 percent of the business and the 2012 transfer of 0.2 percent of the business, the court stated, "The behavior of Husband and his family did not demonstrate what the parties may have intended by their earlier actions." In other words, the trial court suggested that it had an empty record on the parents' intent and actions in 2006 and 2007.
There is no dispute, however, that, in 2006 and 2007, the parents conveyed stock and received no payment. There is no dispute that the parents consulted an expert about conveyance options and that they and their expert said that they settled on gifting. Their actions were consistent with the requirement that husband needed to own at least a 20 percent interest in the business in order to participate in McDonald's Second Generation Program. In their testimony, husband's parents expressed one, consistent, *386 donative intent. Both parents testified that their intent had been to donate their stock solely to husband and that the parties' recent marriage had played no role in their decision. As the father put it, there was "no reason" to give stock to wife. The parents' donative explanation for those transfers was consistent with the testimony of accountant Hall. Hall confirmed that the 2006 and 2007 transfers had been gifts, as documented by gift tax returns and the absence of any sale agreements. Because those trial witnesses were the same people who were themselves the transferors of their shares and who confirmed their donative intent, their testimony at trial, as well as their actions at the time of events, did "demonstrate" their intent. The trial court's suggestion of an empty record on the point is contrary to the only record of events in 2006 and 2007.
E. Credibility Finding
Necessarily, this court accepts the trial court's finding on credibility. In doing so, however, it is critical to recognize what the trial court did and did not find. What the trial court did find was that husband's testimony was not credible. It was husband who claimed that all of the shares he received, including the 45 shares received in 2012, were by gift. His contention that even those later shares were gifted is belied by his *875 admission that he allowed his father to receive husband's half of the proceeds of the sale of the Clackamette franchise in 2012.
It is significant that the trial court did not find that husband's parents or their advisor Hall lacked credibility. The court could have done so expressly if the court questioned their credibility, but it did not. Ordinarily, in the absence of an express finding that the parents lacked credibility, we might assume an implicit finding on credibility because the trial rejected the contention that any transfers of shares were gifts. However, we cannot assume that a trial court made an implied finding when it would be inconsistent with an express finding that the court did make. State v. Hoehne , 163 Or. App. 402, 407, 989 P.2d 469 (1999), rev. den. , 330 Or. 252, 6 P.3d 1099 (2000). In this case, we cannot assume that the trial court rejected the testimony of accountant Hall and husband's parents about their donative intent when they *387 transferred shares in 2006-2007. That is because the trial court expressly found that husband's father "received payment for some portion of the business, although not the entire amount ." On this record, the "some portion" that the father did receive is the money that the father later received from husband's share of half the proceeds of the sale of the business's Clackamette franchise in 2012. However, the remaining balance, to which the trial court refers as "not [payment for] the entire amount," would be the balance of the business interest that husband originally acquired without payment in 2006-2007. Absent payment and given a binary choice, that earlier interest would necessarily be acquired by gift. For that reason, the parents' credibility is not implicitly impugned. Given the trial court's express finding of only part-payment, the trial court did not, and could not, implicitly find three witnesses-an accountant and both parents-to be without credibility. That is not an assumption that this court properly can make.
F. Imagined Agreement
It is significant that the trial court did not expressly find, based on events in 2012, that there must have been a purchase agreement in 2006-2007 whereby husband later would make payment in a sum certain in 2012 for the shares to be transferred in 2006 and 2007. The parties certainly agreed that there had long been a "plan" of succession that contemplated the parents' or father's retirement, but that general concept begs the question whether the succession would proceed by gifting or sale. That is why it remains significant that the court's findings did not posit, imagine, or infer, in a retroactive fashion, that there was a commitment in 2006 to pay a sum in 2012. We cannot assume that the trial court made an implicit finding for the several reasons that we now examine.[12]
*388 First , the theory of a preexisting agreement requires a speculative and impermissible chain of inferences. Indeed, the better term would be a cloud of inferences. The theory of a preexisting agreement would assume that, because husband allowed his father to receive husband's distribution from the Clackamette proceeds in 2012, that husband did so pursuant to a prior agreement reached in 2006. There is, however, no testimony or document in the record of any such agreement, oral or written, in 2006 or 2007. That theory assumes that the parties then believed that husband would have money in the future that, by all accounts, he lacked in 2006. That theory disregards the fact that, even in 2012, the proceeds that the father received were not from husband or wife's own savings or personal assets but, instead, came from liquidation of a part of a business itself-a franchise asset that the parents' business had owned from the beginning.
That theory requires an assumption that husband and his parents would have intended in 2006 to sell one of the three franchises, *876 would have known what the father or mother would need in retirement, would have known what the sale of a franchise might yield in net proceeds after taxes, would have believed that a qualified buyer of a franchise would be found acceptable to the McDonald's franchising authority, and would have known that husband's parents (then still married) would be satisfied with the father (alone) receiving husband's half of an unknown distribution from the net proceeds of the sale of whichever franchise was sold. Those assumptions would require the parents to have been fortune tellers.
Whether such a chain of inferences is permissible is a legal question. This court has explained:
"Whether particular circumstantial evidence is sufficient to support a particular inference *** is a legal question for a court to decide. There is a difference between inferences that may be drawn from circumstantial evidence and mere speculation. Reasonable inferences are permissible; speculation and guesswork are not."
State v. Bivins , 191 Or. App. 460, 467, 83 P.3d 379 (2004) (internal quotation marks and citations omitted). We have *389 stressed that, "[i]t is the court's role to determine-as a matter of law-where the 'sometimes faint' line must be drawn between those inferences that are reasonable and those that are too speculative." State v. Hennagir , 246 Or. App. 456, 461, 266 P.3d 128 (2011), rev. den. , 352 Or. 33, 281 P.3d 611 (2012). In this case, that chain of inferences is too speculative to be permissible. See State v. Oller , 277 Or. App. 529, 535, 371 P.3d 1268 (2016), rev. den. , 361 Or. 803, 401 P.3d 1187 (2017) ; Chapman v. Mayfield , 263 Or. App. 528, 329 P.3d 12 (2014), aff'd, 358 Or. 196, 361 P.3d 566 (2015) (regarding chains of inferences).
Second , the theory that the parents consciously planned from the beginning to have husband pay for all of his shares in the business in this way is not rational. That is because the parents, through Expressway, owned all three restaurant franchises before husband was involved. To conceive of giving husband an interest in Expressway in order that, upon sale of one of the three restaurants, husband would allow "his half" of the sale proceeds to be "paid" to father is, in essence, to plan to give husband the money with which to pay the parents (or father) for husband's interest in the business. That sort of agreement would be a plan to give husband the money with which to buy the business. That sort of plan would be an elaborate gift, in itself.
Moreover, that plan would be a pointless gift. If the parents had intended in 2006 that father would retire with the proceeds of the sale of one of their three restaurants, then they could have done so simply by selling one of the franchises before husband was involved. Or, the parents could have involved husband in only two franchises, while keeping a third franchise outside Expressway to be sold later by the father for his sole benefit. Structured either way, the parents would have accomplished the same thing without any need for such an imaginary stock-purchase agreement with husband. In other words, if , in 2006, the parents had consciously planned this circumstance as a stock-purchase agreement, based on speculation about the 2012 sale, such an inference is not plausible, nor reasonable.
Third , even if the theory of a long-standing agreement were indulged, it still cannot be sustained as a reasonable inference to support the trial court's conclusion that no *390 gift occurred. That is due to the trial court's express finding that husband's father only received part-payment for husband's half-interest in the business-through husband's Clackamette proceeds received by father in 2012. Given that finding, to the extent that husband's acquisition of his interest in the business was not acquired by purchase, it was necessarily acquired by gift. For those several reasons, speculation based on circumstances in 2012 should not be used to project retroactively, that a purchase agreement existed in 2006 involving payment for all shares in the business. For those several reasons, this record does not support a permissible inference that there was a true purchase agreement, rather than gift transfers in 2006 and 2007.
G. Gift Characterization
Absent evidence of any payment or nonspeculative inference of a long-standing purchase *877 agreement, the record, as well as the court's finding of incomplete "payment," should have required the conclusion, as a matter of law, that husband's initial receipt of an interest in Expressway was "property acquired by gift" and held by husband in his name alone from the time of receipt. See Fine and Fine , 272 Or. App. 307, 317, 355 P.3d 198 (2015) (concluding that the trial court lacked sufficient evidence for a finding in a property division regarding $138,516 wife claimed to have spent on a residence during separation). Pursuant to ORS 107.105(1)(f)(D), that stock, gifted in 2006 and 2007, was a separate asset. Contrary to the trial court's conclusion, that initial portion of stock was not then a marital asset, and, by reason of statute, that gifted stock was not subject to a presumption of equal contribution. Consequently, the trial court's statement that husband failed "to rebut the presumption of equal contribution" is inapt, as a matter of law, to the extent that the statement pertained to the 2006 and 2007 transfers.
IV. 2012 STOCK TRANSFER
The circumstances in 2006 and 2007 contrast with the circumstances in 2012. As to the later circumstances, the trial court's finding that husband's father received some payment for some shares in Expressway is supported *391 by evidence in the record. The proceeds of the sale of the Clackamette franchise in 2012 are what wife characterizes as payment for Expressway shares. The net proceeds of the sale were $520,000. At the time of the sale, husband had become a half owner, and, as a consequence, the proceeds were divided between husband and his father. Husband testified that he "got half of the money-as distributed through the ownership." But husband testified that he then "gifted" money to his father, and that a combination of moneys, from Expressway and from husband, provided husband's father with $520,000.[13]
The evidence reflects that the sale of the Clackamette restaurant was devised as a means of liquidating a corporate asset and of providing husband's father with its proceeds upon which to retire from active involvement in the business. To be careful, we must recognize that half of the net value of the sale to husband's father, i.e. , $260,000, is a distribution that correlates with the father's own half ownership and that a portion of the sale proceeds, from Expressway to husband's father, would not be marital funds. However, husband's portion of the sale proceeds-the other $260,000 that husband "gifted" to his father-would have been income to husband during the marriage. That portion of the sale proceeds was a marital asset.[14]
Coincidentally, after the Clackamette sale, husband's father transferred 45 shares of stock.[15] Although husband describes the 2012 stock transfer from his father as a gift like those before, it is on this point where the trial court's *392 credibility finding applies. The evidence of circumstances surrounding the 2012 transfer belies husband's claim that the final transfer was a gift. That transfer involves the acquisition of an asset during the marriage, and that transfer coincides with the use of marital funds-husband's $260,000 "given" to his father. Whether or not those events are described as a purchase pursuant to an agreement does not matter. It does not matter whether there was a conscious agreement to buy and sell that final fractional interest in the business. The 2012 transfer *878 and the use of that much marital money, mean that the entirety of husband's interest in the business cannot be treated as separate, gifted property, as husband urges. Commingling becomes the issue.
V. COMMINGLING
The use of marital funds in 2012 to promote the retirement of husband's father and husband's receipt of 45 more shares is but one way in which commingling may occur. Wife also contends, even assuming gifting, that husband's interest in the business was otherwise commingled so as to justify its equal division like an ordinary marital asset. Agreeing, the trial court concluded that, even if husband's business interest was a gift, commingling justified an equal division. The trial court found that the parties treated the business as a joint asset because the parties used a business account like a personal account and because "[w]ife relied on the business as a joint asset." In addition, the court found that wife had a reduced income from the business, which represented a contribution to the growth of the business. In the end, the court reasoned, "the law requires the court to divide all property equitably based upon a just and proper analysis." To assess those several statements in the context of this record, I examine them in turn.
As a review of case law will show, the evidence of those other forms of commingling-those things other than the 2012 money-may be of lesser effect here than in other cases that conclude with an equal division of gifted property.[16] Here, an assessment of commingling begins with recognition that the shares in Expressway were at all times held *393 separately in husband's name alone. Husband's business interest was not converted into other business or property assets in joint names. The management of the restaurant business was husband's responsibility; wife did not manage the business.
As accountant Russell testified, the parties ran personal expenses through the business, but, at years' end, payment for those expenses was recharacterized for what it was-that is, as draws or income. Like husband's salary, that expense money was simply income from an asset, not a change in the ownership of the asset itself.[17]
Although the trial court commented that wife treated the business as a personal asset, the Supreme Court has stated that the test "in deciding whether the court should include a separately acquired asset in the property division because of commingling" is a question whether the gift-recipient spouse "demonstrated an intent to retain that spouse's separately acquired asset as separate property" or, instead, demonstrated an intent that the asset become a joint asset. Kunze , 337 Or. at 142, 92 P.3d 100. Here, the parties lived off of the income from Expressway, but no evidence indicated that husband intended to treat the business principal-ownership of the asset itself-as joint property.
Although the trial court observed that wife was employed in the business as a bookkeeper, the trial court also observed, in its colloquy, that "wife didn't contribute in the same way that her mother-in-law did." While husband's mother primarily did the bookkeeping, wife's initial salary was only $10,200, but her salary became $25,733 in 2010, $38,500 in 2011, and $40,000 in 2012, her last full year with Expressway. After wife took over, her work required some-what less than full-time hours-25 to 30 hours per week. Assuming 30 hours per week or 6 hours per day and allowing 22 work days per month, her $40,000 salary represented an hourly wage of about $25 per hour. In other words, wife was paid as an employee, albeit not as an owner.[18]
*394 For the time period of her employment, there was no comparative evidence of a growth in revenues or other growth in the value of Expressway, such as at the beginning and end of the marriage. What is known is that the assets of Expressway consisted of *879 the same three franchises before the marriage and during the marriage-until the retirement of husband's father. Consequently, there was no evidence of wife's contribution to a growth in the value of husband's business interest.
Significantly, the trial court's statement of the law on commingling was too summary, if not inaccurate, when the court declared that, "even if *** the business transfer was a gift alone ***, the law requires the court to divide all property equitably based upon a just and proper analysis." As noted, the proper analysis begins with identifying property, received during the marriage, as gifted and separately held. ORS 107.105(1)(f)(D)(i). Tentatively, such property might be distributed to the recipient spouse without effect on the property division. The final step does requires that the court consider what is "just and proper in all the circumstances." Kunze , 337 Or. at 135, 92 P.3d 100. That inquiry, however, is not an analytical "restart" that invites disregard of the preceding steps that led to finding a gifted asset and its tentative distribution. To disregard the preceding steps in the analysis would render them meaningless.
The final step, instead, is an inquiry into overriding considerations. As noted, those final considerations may include preservation of assets, economic self-sufficiency for both spouses, the particular needs of the spouses or their children, and "the extent to which a party has integrated a separately acquired asset into the common financial affairs of the marital partnership through commingling." Id. at 136, 92 P.3d 100. Here, commingling-principally through 2012 money-is the leading concern, among others. However, the trial court and the majority opinion do not invoke final considerations such as preservation of assets, economic self-sufficiency, or the particular needs of wife or children.[19] The final step in *395 gift analysis cannot be a summary disregard of husband's business interest that is, in some significant part, a gift.
I turn to the case law in order to put this case in the context of the range of results from commingling. The circumstances in this case are unlike those in which the separate moneys of one spouse are commingled with joint moneys of the marriage, rendering a separate sum untraceable. See Kunze , 337 Or. at 138, 92 P.3d 100 (referring to commingling that makes identification of separate property unreliable). The circumstances here are also unlike those in which a separate asset is sold and proceeds are reinvested in jointly held property. Kunze , 337 Or. at 146-47, 92 P.3d 100 (describing treatment of Chaps Court property). The parties' circumstances are unlike those circumstances in which a separate asset is a family home in which the parties raise a family and that the parties treat as a joint asset, investing labor and resources. See Jenks and Jenks , 294 Or. 236, 656 P.2d 286 (1982) (renovating old farmhouse and raising four children); Seefeld and Seefeld , 294 Or. 345, 657 P.2d 201 (1982) (although husband brought separate funds to the marriage, house was purchased in both names, wife helped pay the mortgage, and parties raised a child there); see generally Kunze , 337 Or. at 139-47, 92 P.3d 100 (describing cases).
Generally, the circumstances here are like those in which marital parties are supported by income from a gifted asset, like the rental income from gifted real property. For example, in Morgan , the husband acquired by gift a trailer-manufacturing business previously owned by his father. The husband was employed there, and the income was the primary source for family expenses during the marriage. Morgan and Morgan , 269 Or. App. 156, 158, 344 P.3d 81, rev. den. , 357 Or. 595, 358 P.3d 1001 (2015). Later, the business was liquidated, and the proceeds were reinvested in an apartment building. The rental income from those apartments was the husband's sole income. In the parties' dissolution, principally, the wife received the family home and its equity of $85,000, while the husband received the apartments, valued at over $2,000,000. The court ordered the husband to pay a not-necessarily, "equalizing judgment" of $150,000. The *396 parties had one child, and they had been married nine years before they separated. *880 The wife appealed, arguing that the trial court had erred in failing to award her a larger equalizing judgment. She relied on an earlier case, Finear and Finear , 240 Or. App. 755, 247 P.3d 1238 (2011), rev. dismissed , 351 Or. 580, 273 P.3d 103 (2012), in which we said that the parties' reliance on the husband's inherited property as the sole resource for the family favored " 'allocating some portion of the original inheritance to wife.' " Morgan , 269 Or. App. at 163, 344 P.3d 81 (quoting Finear , 240 Or. App. at 766-68, 247 P.3d 1238 ) (emphasis in Morgan ). In Morgan , this court distinguished Finear as one involving a 21-year marriage, and we quoted Finear for its observation, that
" 'because it is an equitable consideration, commingling is not an all or nothing proposition. Instead, commingling falls along a spectrum. In some cases, a particular asset may be commingled to such an extent that it would be inequitable to divide it in any manner other than equally. In other cases, an asset may be less commingled and therefore subject to a split into unequal shares.' "
Morgan , 269 Or. App. at 164, 344 P.3d 81 (quoting Finear , 240 Or. App. at 765, 247 P.3d 1238 ). In Morgan , we recognized that the husband's intention was that the inherited business, which owned the apartments, remain a separate asset. The husband "was in charge of the business decisions," while conferring with his wife on "minor matters." Id. The parties' reliance on the inheritance as their source of income weighed in favor of affording wife "some portion of husband's inheritance." Id. (emphasis in original). However, we concluded that the comparatively modest equalizing judgment of $150,000 did not reflect an abuse of discretion. Id.
Circumstances vary, and so, too, do the results of commingling. Yet, even in a 20-year marriage, as was the situation in the leading case on commingling, Kunze , 337 Or. at 142-47, 92 P.3d 100, some separately held properties, which generated income on which the parties lived, were treated as separate properties, while another property, which was titled jointly, was treated as a marital asset. Id . (distinguishing treatment of gifted National City property and premarital equity in Germantown Road property from jointly held Chaps Court *397 property). That disposition illustrated the court's statement, "We caution, however, that acts of commingling do not mandate in all cases the inclusion of separately acquired property in the property division." Id . at 142, 92 P.3d 100.
In this case, the parties' marriage was not 20 years long as in Kunze , nor 21 years long as in Finear . At the time of separation, the parties had been married seven years and had been together a total of nine years. Considering the factors that may indicate the recipient spouse's intention that a separate asset should become a joint asset, the record is unchallenged that husband's business interest was held separately, not jointly, and that control over his business interest was not shared between the parties. See Kunze , 337 Or. at 141, 92 P.3d 100 (first two of three factors). To be sure, husband and wife received income, in salary, draws and expenses paid from the profit in the business. See id . (third factor). But, in all, such reliance was a reliance on an asset's revenue as in Morgan , rather than conversion or management of an asset itself as a joint asset.
Of more significance for this case, husband allowed his half of the distribution from the Clackamette sale proceeds to be paid to his father. To the extent that husband permitted husband's half of those proceeds to go to his father, husband used his own distribution to help his father retire, and, coincidentally, husband gained majority control of the business. Because husband's distribution was his money, it was marital money. Use of that marital money in that way gave wife "some interest" in husband's otherwise separate business interest in Expressway. See Morgan , 269 Or. App. at 164, 344 P.3d 81 (recognizing the wife was entitled to "some portion of husband's inheritance").
As the courts recognized in Kunze and in Morgan , the effect of commingling is not an all-or-nothing proposition. All-or-nothing was the approach of husband and wife at trial, and it remained their approach on appeal. In effect, all-or-nothing was the legal standard applied by the trial court, when attributing to husband all $900,000 of his interest in the business. The trial court divided all of husband's *881 business interest between the parties (a "50/50 division"), although it expressly found that husband's father had only *398 "received payment for some portion of the business," which was "not the entire amount ." (Emphasis added.)
Mindful of Kunze and Morgan , the majority should have concluded that, on this record, the treatment of husband's business interest as an all-or-nothing proposition was error as a matter of law. No evidence contravened husband's evidence that the shares transferred in 2006 and 2007 were gifted. Failure to recognize that husband held some gifted interest in the business should have required reconsideration. At the same time, there was evidence that the shares transferred in 2012 coincided with the use of marital funds, supporting the trial court's conclusion of commingling. The trial court's finding of a partial "payment" required recognition that wife has "some interest" in the restaurant business. See Morgan , 269 Or. App. at 164, 344 P.3d 81 (recognizing the wife was entitled to "some portion of husband's inheritance"). A reevaluation of those two interests-his and hers-should have required reconsideration of the property division.
Because instead the majority assumes a speculative inference of a preexisting purchase agreement, employs an outdated, default presumption, and exaggerates the "just and proper" step of gift analysis, I respectfully dissent.
Tookey, J., DeHoog, J., and Aoyagi, J., join in this dissent.

By this time, husband's parents had divorced and husband's father was the remaining owner of the parents' interest.

In an email message in June 2012, husband told his father that husband would like to write his father a check for $400,000, "along with other things [they] discussed to get the total [father] said was the total [father] would be happy with to retire." A week later, husband sent an email message to his accountant saying that husband's father "has been funded" and that his father had received a check for $400,000.

Wife's father testified to conversations he recalled with husband. Based on those conversations, her father testified that the original plan was to have been a purchase, but the plan "transitioned over" to a "gifting process." After the Clackamette sale, he said, husband's father still wanted $180,000, and money changed hands.
Taylor, the husband of a friend of wife, testified about a conversation he had had with husband in 2010 or 2011-well after the 2006 and 2007 stock transfers and not long before the 2012 transfer. Taylor recalled husband talking casually about paying to buy out his father. According to Taylor, the plan was "to sell a store and that would allow them to retire [the father] out and take ownership of the business."

The court also provided for reimbursement to wife for certain real estate costs and recognition of a support arrearage, making the ultimate equalizing judgment $399,776.

In the absence of the former, general, default presumption, the statute now makes no express allocation as between the parties whether one party or another bears a burden of proving whether subparagraph (C) or (D) should govern characterization of property.

Previously, as described in Kunze and Kunze , 337 Or. 122, 133-34, 92 P.3d 100 (2004), the first question was whether the disputed property was acquired during the marriage. If so, the second question was whether the recipient had rebutted the presumption that the other spouse had contributed equally to its acquisition. If the presumption was rebutted, the third step was nonetheless to consider what is just and proper in all the circumstances. Id . at 135, 92 P.3d 100.

The Kunze opinion noted that other jurisdictions have termed this latter form of commingling as "transmutation." 337 Or. at 139 n. 11, 92 P.3d 100 (citing Peterkin v. Peterkin, 293 S.C. 311, 360 S.E.2d 311 (1987) ; Stainback v. Stainback, 11 Va. App. 13, 396 S.E.2d 686 (1990) ).

If the trial court had intended to say what the majority says, it would have said that husband's father "received payment for some portion of the business, although husband did not receive the entire [amount] portion of the business ."

As a word of common usage, "amount" means "1a: the total number or quantity * * *." Webster's Third New Int'l Dictionary 72 (unabridged ed. 2002).

The majority assumes that the characterization of the stock transfers at two different times allows only one answer because husband argued both sets of transfers were gifts while wife argued both were purchases. However, the court ought not be bound to a simplistic choice between either party's self-serving, single conclusion when the court is presented with two sets of facts, requiring potentially different answers. I suggest that the appropriate answers will prove to be different and something neither party promoted. That is, the evidence shows a substantial gift occurred initially but, five years later, substantial commingling occurred.

Generally, because a dissolution proceeding under ORS 107.085 (petition) and ORS 107.105 (judgment) proceeds on one broad petition, met by a cursory "response," rather than as a pleading with distinct tort or contract claims, a dissolution is unlike other adversarial proceedings. Further, because ORS 107.105 (1)(f) eliminated a universal presumption on treatment of property, an unthinking reliance on evidentiary rules about burdens of proof on claims or defenses may prove to be misplaced rather than appropriate. Compare OEC 305 ("A party has the burden of persuasion as to each fact the existence or nonexistence of which the law declares essential to the claim for relief or defense the party is asserting.") (Emphasis added.) and OEC 307(1) ("The burden of producing evidence as to a particular issue is on the party against whom a finding on the issue would be required in the absence of further evidence.") (Emphasis added.) with Salgado , 258 Or. at 564, 310 P.3d 731 (neither spouse has burden of proving value of business) and Cook , 240 Or. App. at 11, 248 P.3d 420 (neither spouse has burden of proving existence of marital asset).

The majority seems to concede that there was, in 2006-2007, no preexisting contract for husband to purchase his parent's shares. For the majority to suppose that the father had a mere "expectation that he eventually would be compensated for those shares" is to concede that, in fact, there was no actual stock sale agreement in 2006-2007. 290 Or. App. at 367, 414 P.3d at 864 (emphasis added). And, to say that, "[b]y the summer of 2012, husband and his father appeared to be close to finalizing the terms of transferring the business to husband," id , (emphasis added) overlooks that 49.9 percent of the business had already been transferred in 2006-2007, while admitting that no agreement had been made until that which was done in 2012.

In a rough parallel, wife, when describing a proposed but inchoate arrangement for husband's receipt of 100 percent of the shares , testified that the sale of the third restaurant would provide money for husband's father and that husband would provide his father with $180,000 over time. When describing the events that unfolded, she spoke of Expressway allowing draws and paying a variety of the father's personal debts.

Wife stressed a $25,000 loan from the business to father, which he was not expected to repay, as well as other personal expenses that the business would pay as inducement for the father's retirement. Those payments for father's benefit, by definition, are corporate expenditures, drawn from business profits or assets like the Clackamette sale. Those payments are not evidence of payment from husband for stock.

As noted, that transfer of 0.2 percent of corporate ownership made husband the majority owner of Expressway and put husband in position as so-called "P1" or "primary operator" for purposes of managing the McDonalds franchises.

Of course, that ultimate assessment should remain for the trial court.

The lesser effect of living off the income of a separate asset will be addressed in the discussion of case law to follow.

Husband's mother had been an owner and been paid more.

Contrary to the goal of preservation of assets, husband complains that a judgment for $396,940 would require him to sell one of the two remaining restaurant franchises.